THE PEOPLE ex rel. H. J. Hamlin

v.

CHARLES H. PAYSON.

*Opinion filed April 17, 1905—Rehearing denied June 7, 1905.*

1. ATTORNEYS AT LAW—*right to practice under license continues only while good moral character is retained.* To entitle a party to continue the practice of law under a license obtained in this State he must continue to be of good moral character.

2. DISBARMENT—*effect of conviction of crime as a ground for disbarment.* The fact of conviction of crime in a foreign State, followed by pardon and the lapse of many years, is not always ground for disbarment, but if there are other circumstances tending to show the attorney has not reformed his evil conduct, the consequences which the law attaches to such conviction, when considered with his subsequent conduct, will be given effect.

3. SAME—*transactions between attorney and clients not purely private matters.* Transactions between an attorney and his clients in which the conduct of the attorney has been fraudulent or blameworthy are not such private matters as preclude their investigation and consideration by the court upon an information for disbarment, since a licensed attorney is an officer of the court, and both the court and the public are interested in maintaining a high standard of fidelity and honesty among attorneys.

4. SAME—*what is ground for disbarment.* Using a bogus affidavit, refusing or failing to pay over moneys collected as attorney, deceiving a client as to the amount collected on a breach of promise claim and appropriating the excess, and obtaining money from clients by falsely representing the necessity for its use or for services not rendered by the attorney in the litigation, is such conduct as will justify disbarment.

INFORMATION for disbarment.

W. H. STEAD, Attorney General, J. W. KERN, State's Attorney, and C. G. HIRSCHI, (O. F. MORGAN, and A. F. GOODYEAR, of counsel,) for the relator.

CHARLES H. PAYSON, *pro se.*

Mr. CHIEF JUSTICE RICKS delivered the opinion of the court:

An information on the relation of C. G. Hirschi, acting State's attorney for Iroquois county, was filed in this court for the disbarment of respondent as a practicing attorney and to strike his name from the roll of attorneys. The information contains twelve distinct charges set out at great length and with particularity, each of which, except the first three, respondent in his answer denies.

The information and proof show that the respondent is about fifty years of age; that in September, 1877, a license was granted to him by this court to practice the profession of law during his good behavior in such practice; that in 1878 he went to Winfield, Cowley county, Kansas, without, so far as the record shows, having done any active practice in this State up to that time; that on the 11th day of May, 1878, by an order of the district court held in said Cowley county, Kansas, he was admitted to practice law in all the district and inferior courts of that State, and continued to practice there until his disbarment in that State, which occurred in December, 1879.

The three charges contained in the information which respondent does not traverse are, that he was convicted of a misdemeanor in the district court of Cowley county, Kansas, in December, 1879, was disbarred by the same court during the same month, and was convicted of a felony in said court in May, 1880. The misdemeanor of which respondent was convicted was the withholding of $163 entrusted to him by one Sarah Clark to be loaned and invested for her. Upon that charge he was tried by the court without a jury, being represented by himself and other counsel, was found guilty and a fine of $100 was imposed, which he subsequently paid. The disbarment proceeding was predicated upon the same transaction, and to the information there filed he filed his answer denying the charge, and the cause was heard by the

court, and he was again found guilty and his name stricken from the roll of attorneys. The charge upon which he was convicted of felony was that of feloniously, knowingly and designedly obtaining the signature of Lena McNeil to a deed to certain real estate in Cowley county, Kansas, conveying the land to him, when the grantor intended, and he represented, that the deed conveyed the land to Martha E. Mc-Neil, the daughter of the grantor. Upon that charge he was tried before a jury, being represented by counsel, and was found guilty and sentenced to a term of five years in the penitentiary. After serving a year and a half of that sentence, through the influence of prominent relatives and friends he was pardoned by John P. St. John, the then Governor of Kansas, upon condition that he should thereafter remain away from Cowley county, and that if that condition were broken he would be again arrested and required to serve his unexpired term.

During the year 1884 respondent returned to Illinois, and at Watseka, in Iroquois county, entered upon the practice of his profession under the license issued by this court. Up to 1891, so far as disclosed by the record, he was not charged with any dishonest or dishonorable act. In April, 1891, Albert W. Perry was the owner of certain property at DelRey, in Iroquois county, which was destroyed or injured by fire. The property was insured by the German Fire Insurance Company of Peoria, Illinois. Mr. Perry employed respondent to collect that insurance and agreed to give him $50 for his services. Judgment was obtained against the company by default for $400, the amount claimed. After the judgment the company sought by injunction to prevent its collection, and that case was taken to the Appellate Court but was decided adversely to the company. Upon the dissolution of the injunction respondent was allowed $40 attorney's fees for his services in that case. The judgment and the $40 attorney's fee were paid respondent in full on the fourth day of January, 1893. On the 10th of March of the same year Mr.

Perry went to Watseka, saw respondent, asked him about the judgment, and was advised by respondent that the company had sixty days from that time within which to pay, unless it chose to pay sooner. Mr. Perry waited until the 15th of May, and not having heard from respondent, employed another firm of lawyers to investigate the matter, and learned from them the time of the payment to respondent. When approached about the matter by the new firm of attorneys, respondent insisted that he was entitled to more compensation than the $50 agreed upon for his services, and though urged to pay what he admitted to be due, declined to do so. Suit was brought against him in June, 1893, and he paid $225.50 in cash and confessed judgment for $75 by way of settlement. The services of attorneys to collect from the respondent the sum of money that was thus held by him cost Mr. Perry $60.70.

The firm of Blaine & Fraser had been conducting business at Ashkum, in Iroquois county, some years, and obtained a judgment before a justice against a man and wife by the name of Mathias for $139.60. The firm dissolved partnership about 1891, and in their dissolution adjustment this judgment fell to Blaine, who lived at Kankakee. Blaine employed respondent to collect the judgment. In 1893 respondent collected $139.60 on this judgment. Fraser, not being interested, never heard of the collection or paid any attention to it. Although Blaine wrote respondent he received no reply to his letter. In 1895 respondent became involved with a Mr. Beard, the editor of a paper at Watseka, and charged the latter with publishing libelous matters concerning him. At that time the conduct of respondent was being inquired into, and in the course of that inquiry it was ascertained that the respondent had collected the Blaine & Fraser judgment, and Mr. Blaine was then notified and wrote respondent and demanded payment but received no reply. During the trials in which respondent was prosecuting Beard, Mr. Blaine was present and demanded payment of the

judgment, and respondent insisted that he had paid the same to Fraser. During the Beard trials respondent was a witness, and testified that he paid Fraser upon an Illinois Central train between Gilman and Kankakee within thirty days after he made the collection, and stated that he had the full amount of the money, and that that was an unusual thing for him. During the year 1895 steps were taken to file an information in this court to disbar respondent, and he then went to Kankakee and by payment of $20 or $25 to Blaine effected a settlement with him. The information that was prepared in 1895 was submitted to the Attorney General but was not filed in this court. Respondent was given an opportunity to meet the charges then contained in the information, and among other things he presented to the Attorney General what purported to be an affidavit of Mr. Blaine, in which he stated that full and satisfactory settlement had been made with him. Respondent claims that that original affidavit was lost in some manner, and upon this hearing he presented an office copy, but was unable to state before whom the affidavit was made. Mr. Blaine testified that he had no recollection of making any such affidavit. In his answer to the present information respondent stated that he paid that judgment to Fraser in a saloon in Kankakee within two or three weeks after it was collected; that he borrowed part of the money with which to make the settlement, and that Fraser stated it was just like finding the money. Fraser testifies that he never at any time paid him any of the money.

In 1891 Alton C. Wright employed respondent to foreclose a mortgage against one Starr. The mortgage provided for a solicitor's fee of $25, which Mr. Wright testifies was to be the fee that respondent should have for his services. At the June term, 1891, of the circuit court of that county respondent obtained a decree and judgment in the foreclosure for $390.77. On that judgment there was paid to him July 21, 1891, $100; December 15, 1891, $185; August 25, 1892, $20; October 12, 1892, $28. On December 29, 1891,

respondent paid Mr. Wright $100, and in September, 1892, paid him $100. Mr. Wright saw respondent many times and pressed him for payment, but respondent continuously put him off, stating that he was not able to make up the amount or hadn't the time. In 1895, in one of the Beard trials, respondent stated that there was no doubt but that there was money due Mr. Wright. Mr. Wright testifies that since 1895 he has not asked respondent for it, as it seemed useless to do so.

In 1892 Henry M. Hayen employed respondent to bring a suit in assumpsit in Iroquois county against one Rogers. Judgment was obtained at the March term, 1893, of the court for $667. There were paid to respondent upon that judgment the following amounts: May 9, 1893, $250; August 8, 1893, $300; September 2, 1893, $145; February 13, 1894, $5.45, making a total of $700.45. June 19, 1893, respondent wrote Mr. Hayen in reply to a card inquiring as to the collection of the money, in which he says: "I wrote you some time ago to send me $75 on account. The judgment will be paid about August 1. I have made arrangements with Mr. Rogers, satisfactory to myself, whereby the money will be made for you as speedily as the law would compel him to pay it. As soon as the matter is settled I will notify you, and you may come over and we will settle the matter of ours. I was quite disappointed on account of your not complying with my request for fees." Waiting until after the first of August, and getting no information as to the payment of the judgment, Mr. Hayen employed Judge Meek, of Eureka, to look the matter up for him. We deem it unnecessary to recount the many efforts made by Judge Meek to collect this money. It was finally wound up at the latter part of the year 1894 by respondent paying all but $75, retained by him for his fees. Touching this matter a number of letters from respondent to Judge Meek are in the record, and they show, as clearly as could be shown by the testimony of the whole neighborhood, the utter recklessness of the re-

spondent in the matter of making promises, and likewise the utter disregard of them when made.

In the latter part of 1890, or early in 1891, the D. M. Osborne Company placed in respondent's hands for collection three notes against William Morton, of Wellington, Illinois. By appointment Mr. Morton met respondent at Wellington on the 29th of January, at which time Morton paid him $40 in gold, which was credited upon the notes. The money was borrowed from some grain men and was paid to respondent in a hotel. In February of 1891 respondent's office and papers were burned, and respondent claimed that the Morton notes were destroyed by that fire. An agent of the company was sent to get the notes renewed, and Morton claimed the payment of $40. This respondent denied. Suit was brought against respondent for this money and a judgment obtained, which was subsequently paid.

In February, 1903, Theresa Horner, a German lady of the age of about twenty-five years, entered respondent's office and advised with him concerning a matter with August Schroeder, a German farmer of Iroquois county. Mr. Schroeder was a widower, and Mrs. Horner had worked for him about a year and had been away from Schroeder's about a year at the time of the conference with respondent. She claimed that she and Schroeder were engaged to be married, and that, in violation of the promise of marriage to her, Schroeder had married another woman. She said that she thought she ought to have $200. Respondent says he told her that she could get $500 as easily as $200. Mrs. Horner says he said he could get $1000 as easily as $200. Mrs. Horner states that she did not want more than $500, and that she gave respondent a power of attorney authorizing him to effect a settlement with Schroeder. In the claim of Mrs. Horner that she did not think she was entitled to more than $200 and did not desire more than $500 she is supported and corroborated by another witness. Respondent stated that he would get that amount for her and make Schroeder

pay his fee. Respondent visited Schroeder and stated that he had certain letters that would be damaging to him, and asked Schroeder for a proposition of settlement. Schroeder offered first $1000, then $1500, then $2000,—all of which respondent declined, and made a counter-proposition that he would take $4000. In these conversations respondent said that he did not think his client would be satisfied with any of the offers made by Mr. Schroeder. Finally the matter was settled by Schroeder's giving respondent three notes, each for $1000, one due in thirty days, one in one year, with seven per cent interest, and one in two years, with seven per cent interest. Respondent took the notes and had them cashed, discounting them $500, and received in cash $2500. He represented to Mrs. Horner that he had received $600 and paid her $500 and took her receipt, in which she expressed herself as being entirely satisfied with the settlement. Mrs. Horner lived in Chicago at that time. The amount of the settlement became public, and respondent apprehending unpleasant results from the publicity of it, sought Mrs. Horner in Chicago and had her there write a letter, stating, in substance, that she was fully advised in the matter and was satisfied with it, and wished that other people would attend to their own business. Respondent was subsequently indicted for the embezzling of the money as the money of Mrs. Horner, who had then married a man named Schmidt.

There can be no doubt, in examining this record and reading the evidence, but that respondent sought to frighten Mrs. Horner so as to induce her to leave the State, and represented to her that both he and she were likely to get into serious trouble about the Schroeder settlement. Mrs. Horner did leave the State and go to California, but did not remain there. She returned, and a trial was had upon the charge against respondent of embezzlement and he was acquitted of that charge. It is now said that the matter here involved is not open to the consideration of this court, and so far as it relates to the charge of embezzling money from

Mrs. Horner we accede to the contention; but in so far as the character of respondent for honesty and professional honor is involved in the transaction, as it relates to respondent's treatment of Mr. Schroeder, we think the question still an open one. As a general proposition the freedom of contract is and should be unrestricted, and especially so, so long as the subject matter of the contract is lawful. We are not prepared to say that a lawyer may not lawfully contract with his client to recover a given sum for the client, and in addition thereto his proper and reasonable fees; but in the particular instance now before us, if an attempt should be made to characterize the conduct of respondent, no words less than those of unconscionable extortion would seem adequate. He knew his client felt that she was only entitled to $200, but yielded to his suggestion to take $500 if she could get it and allow him to collect his fee in addition thereto. To allow respondent half as much for his fee as he recovered for his client, acting under the power of attorney and without suit, would be most liberal. Respondent himself says that he would be glad to do the same work for $25 or $30. He received and kept $2000 for his services, which cost Schroeder $2500. One can hardly comment upon such conduct without indulging in epithets; and in reference to this charge we deem it unnecessary to say more.

Another charge made in the information is that respondent paid $175 to certain witnesses resident in Indiana to prevent their attendance at court to testify in the case of *People* v. *David,* in which the latter was charged with incest, and which was pending in Iroquois county. Respondent admits receiving the $175, but states that it was expended in the procurement of a letter written by the State's attorney concerning the case, to the Indiana witnesses. Respondent claims that that letter was procured through one Palmer, a resident of Monticello, Indiana. The relators claimed, and proved by counsel who represented David in the suit brought by respondent against David for fees for his services in the

criminal case, and by another witness, that respondent stated that he paid the money to prevent the witnesses attending court. Palmer, who was not one of the witnesses but seems to be a reputable man of business, testified that he forwarded the letter written by the State's attorney to the Indiana witnesses, to respondent, and that respondent did not and was not to pay $175, or any other sum, for that letter. The conclusion is almost irresistible that respondent either did pay the money to the witnesses to prevent their attendance on court or that he falsely pretended to do so, and made that statement to his client, David, in order that he would not have to account for the money, and when the matter became involved in litigation he had to change his position and state that the money was furnished to procure the letter.

There are other minor charges which, if deemed proven, are not sufficiently grave to require discussion at length. The respondent denies all the charges that have been made against him relating to transactions in this State. Those we have adverted to specifically and set out the substantial facts concerning, we regard as established by a very decided weight of the evidence.

Touching the charges as to respondent's conviction and disbarment in Kansas, respondent urges that those are stale matters, did not arise in this State, that he has paid the penalty for them, and that they should not now be considered. So far as this record shows, respondent did not avail himself of his right, under his license from this court, to practice law in this State until all the Kansas matters had intervened. To obtain a license to practice law in this State one is required to have and show to the court evidences of a good moral character. To entitle one to retain a license once obtained from this court one must retain a good moral character. The matters involved in the Kansas charges were the result of moral turpitude, and, if they did not absolutely show, tended strongly to show that when respondent entered upon the practice in this State, in 1884, he did not have a

good moral character. We have been unwilling to hold, as a matter of law, that the mere fact of the conviction of crime in a foreign State, followed by a pardon and a long lapse of years, was sufficient, of itself and as a matter of law, upon which to predicate an order of disbarment. We have preferred to adopt the more modern view of *locus penitentiæ.* This latter view we regard as more in accord with the spirit of our institutions, as is evidenced by the various reform schools and the parole system established and obtaining in this State, on the theory that criminals may be reformed; and while, as we have said, we will not make the rule absolute upon the mere record of a conviction long anterior to the filing of the information, we do not, in the consideration of the case, ignore such conviction, but, keeping it before us, look into the life and conduct of the accused from that time on, and if we find that there has been a reformation, and that the individual has become an honored and useful member of society and has shown a proper regard for the duties and responsibilities of his profession, we will discharge the rule. If, on the other hand, as we are constrained to say is the case before us, it appears that the respondent is not benefited by the misfortune that his wrongful conduct brought upon him, but has persisted in his evil doing, we take into consideration the former conviction and all subsequent conduct, and attach to them the consequences that the law imposes.

Respondent further urges that the persons who have been wronged by his conduct are not relators here; that the matters involved are purely private matters, and are not of such public concern as requires this court to consider them upon the relation of the State's attorney. In this respondent is in error. Respondent's license to practice law constitutes him an officer of the court. So, too, are all other attorneys enrolled in this court. Their acts in the line of their profession are from authority of this court and as its officers, and if they be blameworthy they bring discredit not alone upon

the profession, but upon the court. The relation of the court and its attorneys to the people is one of high responsibility, and involves on the one hand absolute trust and confidence, and on the other absolute fidelity and honesty. In maintaining such a standard both the court and the people are interested. (*People* v. *Palmer,* 61 Ill. 255.) This information is upon the relation of an officer of the law, an officer of this court, and presented by the Attorney General, the highest law officer of the State. The proceeding is not one for the adjustment of private grievances, but is to prevent the continuation of public wrong and public wrongdoing.

It is also urged forcibly and earnestly by respondent that there are persons active in the prosecution of this cause who are animated by personal spite and a desire for revenge against respondent. But it has not been suggested, and we think it cannot be established, that any witness to any material thing connected with the case is among those so charged. It is a matter of little consequence what motive prompted the bringing of the charges, if they be true.

The record in this proceeding is very large and has required both time and care to arrive at a proper understanding of it, and we have cheerfully given it such time and care as the importance of the case seemed to require. We realize that to the respondent the situation is grave and the result momentous. The consequences, however, are the results of his acts and the duty imposed upon us by the law. From this record we are fully satisfied that respondent is morally unfit to practice law in this State, that he has forfeited his right, and that the rule should be, and it is, made absolute.

*Rule made absolute.*